**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| CLOVER NOLASCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-CV-1631 (PTG/JFA) |
| | ) | |
| SOLARIS PAPER (MERCURY PAPER) | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S POST-TRIAL STATEMENT OF PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**INTRODUCTION**………………………………………………………………1

**I.      PROPOSED FINDINGS OF FACT**………………………………….………2

*Ms. Nolasco's Education and Experience Prior to Her Employment at Solaris*……………2

*Experience Gained by Ms. Nolasco While Employed at Solaris*……………….……………3

*Vacancy of the Head of Procurement Position*………………………………………………6

*Qualifications Attendant to the Head of Procurement Position*……………………………...7

*Ms. Nolasco's Superior Qualifications* …………………...………………………….……...8

*Ms. Chan Learns of Solaris' Selection of Camil Hung* …………………………….………10

*Ms. Nolasco Speaks to Human Resources About Her Non-Selection*………………….....12

*Ms. Nolasco Speaks to Mr. Chin-Bing About Her Non-Selection*…………………………...13

*Ms. Nolasco Restates Her Complaint of Discrimination During Her Exit Interview*……….14

*Explanations Provided by Solaris at Trial for Ms. Nolasco's Non-Selection*………………14

*Ms. Nolasco's Resignation, Notice Period, and New Employment*…………………………16

*The Impact of Solaris' Actions on Ms. Nolasco*………………………………………....…..16


**II.      PROPOSED CONCLUSIONS OF LAW AS TO LIABILITY**………………..18

     A.  Direct Evidence of Race-Based Discrimination…………………………………18

     B.  Circumstantial Evidence of Race-Based Discrimination………………………...19


**III.      PROPOSED CONCLUSIONS OF LAW AS TO DAMAGES**………………..22

     A.  Ms. Nolasco's Entitlement to Back Pay……………………………………………22

     B.  Ms. Nolasco's Entitlement to Compensatory Damages…………………………23

C.  Ms. Nolasco's Entitlement to Punitive Damages…………………………....…...25

    1.  *The Absence of an Express Request for Punitive Damages in Ms. Nolasco's Complaint Does Not Preclude this Court from Finding Punitive Damages Are Appropriate*……………………………………..25

    2.  *Solaris' Actions Warrant a Finding of Punitive Damages Against the Company*...……………………………………………………………28

D.  Plaintiff's Right to Attorneys' Fees and Costs………………………….…..31

**CONCLUSION**…………………………………………………………………………31

# TABLE OF AUTHORITIES

*Cases*

*Anderson v. G.D.C., Inc.*,
　281 F.3d 452 (4th Cir. 2002)…………………………………………………………..29

*Anderson v. Westinghouse Savannah River Co.*,
　406 F.3d 248 (4th Cir. 2005)…………………………………………………….…..20

*Bowles v. Osmose Utils. Servs.*,
　443 F.3d 671 (8th Cir. 2006)………………………………………………………….26

*Bryant v. Aiken Reg'l Med. Ctrs. Inc.*,
　333 F.3d 536 (4th Cir. 2003)………………………………………………………23, 24

*Cline v. Roadway Express, Inc.*,
　689 F.2d 481, 485 (4th Cir. 1982)…………………………………………………….19

*Dennis v. Columbia Colleton Medical Center, Inc.*,
　290 F.3d 639 (4th Cir. 2002)……………………………………………….20, 21, 31

*Depaoli v. Vacation Sales Assocs., LLC*,
　489 F.3d 615 (4th Cir. 2007)………………………………………………………….24

*Desert Palace, Inc. v. Costa*,
　589 U.S. 90 (2003)…………………………………………………………………….18

*Earl v. Bouchard Transportation Co., Inc.*,
　917 F.2d 1320 (2d Cir. 1990)………………………………………………………….23

*EEOC v. Federal Express Corp.*,
　513 F.3d 360 (4th Cir. 2008)……………………………………………………….29, 30

*Gallina v. Mintz*,
　123 Fed. Appx. 558 (4th Cir. 2005)………………………………………………...29

*Golson v. Green Tree Fin. Servicing Corp.*,
　26 Fed. Appx. 209 (4th Cir. 2002)……………………………………………….29, 30

*Guillen v. Kuykendall*,
　470 F.2d 745 (5th Cir. 1972)………………………………………………………..26

*Harris v. L & L Wings, Inc.*,
　132 F.3d 978 (4th Cir. 1997)………………………………………………………..30

*Holley v. North Carolina Dept. of Admin., N.C.*,
  846 F.Supp.2d 416 (4th Cir. 2012)………………………..…………………21

*In re Landbank Equity Corp.*,
  83 B.R. 362 (E.D. Va. 1987)…………………………………………………26

*Lowery v. Circuit City Stores, Inc.*,
  206 F.3d 431 (4th Cir. 2000)………………………………………………29, 30

*Marlow v. Chesterfield Cnty. Sch. Bd.*,
  749 F. Supp. 2d 417 (E.D. Va. 2010)………………………………………19

*Miller v. Johnson*,
  515 U.S. 900 (1995)…………………………………………………………...19

*McDonough v. City of Quincy*,
  452 F.3d 8 (1st Cir. 2006)…………………………………………………..25

*Moody v. Albemarle Paper Co.*,
  422 U.S. 405 (1975)………………………………………………………...22

*Norfolk & Portsmouth Belt Line R. R. Co. v. M/V Marlin*,
  2009 U.S. Dist. LEXIS 104327 (E.D. Va. 2009)…………………………...23

*Peyton v. DiMario*,
  287 F.3d 1121 (D.C. Cir. 2002)……………………………………………24

*Pine Ridge Coal Co. v. Local 8337, United Mine Workers of America*,
  187 F.3d 415 (4th Cir. 1999)………………………………………………23

*Reeves v. Sanderson Plumbing Products, Inc.*,
  530 U.S. 133 (2000)………………………………………………………20, 21

*Scutieri v. Page*,
  808 F.2d 785 (11th Cir. 1987)……………………………………………...26

*Stamathis v. Flying J, Inc.*,
  389 F.3d 429 (4th Cir. 2004)………………………………………………24

*Taylor v. Va. Union Univ.*,
  193 F.3d 219 (4th Cir. 1999)………………………………………………18

### Statutes

42 U.S.C. § 1981a(b)(3)……………………………………………………..23, 28

42 U.S.C. §2000e-5(k)…………………………………………………………………………….31

**Rules**

Fed. R. Civ. P. 8……………………………………………………………………..…26

Fed. R. Civ. P. 54(c)……………………………………………………………..…..26

**Other Sources**

6A Wright, Miller, & Kane, Federal Practice and Procedure (2d ed. 1990)……………...……26

Plaintiff Clover Nolasco, by counsel, hereby submits her Proposed Findings of Fact and Conclusions of Law in the instant matter against Defendant Solaris Paper (Mercury Paper) ("Defendant" or "Solaris") following the trial which took place on July 30, 2024 and November 12, 2024.

<u>**INTRODUCTION**</u>

Solaris engaged in illegal discrimination. Ms. Nolasco produced ample record evidence at trial to conclude that Solaris' high-level decision makers deliberately chose to ignore federal law and Solaris' own policies to discriminate against her. This conduct epitomizes malice and reckless disregard. Even more egregious is the fact that the decision makers at issue are the two individuals at Solaris most responsible for setting and enforcing Equal Employment Opportunity policy at Solaris.

The evidence presented at trial supports a finding that Solaris discriminated against Ms. Nolasco in violation of Title VII when it failed to promote her to the position of Head of Procurement. Taken side by side, Ms. Nolasco is objectively the superior candidate for the position. Solaris stated in no uncertain terms — through at least three separate high-level individuals on at least four separate occasions — that it did not promote Ms. Nolasco because she did not fit one qualification for the position: she is not Asian. Solaris' actions devastated Ms. Nolasco, who loved both the company she worked for and the individuals she had worked with. Solaris embarrassed Ms. Nolasco, who had trained for several years to take over Ms. Chan's role, by informing the procurement staff that Ms. Nolasco would lead the Procurement team after Ms. Chan's resignation only to then promote Camil Hung, who had neither the experience nor qualifications for the position.

Ms. Nolasco is entitled to backpay and compensatory damages for the economic harm and emotional distress she endured as a result of Solaris' actions. Solaris adopted a cavalier and indignant response to Ms. Nolasco's complaints of discrimination, and this approach extended throughout the duration of the litigation. Their actions affected not only Ms. Nolasco but also, as testified to by Ms. Chan, sullied the success of others outside of Ms. Nolasco's protected class and left them questioning whether that success had been attained through merit or solely by virtue of their race.

These actions, coupled with Solaris' efforts to conceal information and documents and obfuscate the discriminatory nature of its actions were laid bare at trial and require a finding of punitive damages against the company.

## I.     PROPOSED FINDINGS OF FACT

*Ms. Nolasco's Education and Experience Prior to Her Employment with Solaris*

1.     From 2004 to 2007, Ms. Nolasco worked as a Buyer for DuPont. Trial Tr. (vol. 2) 11:15-21; Pl.'s Trial Exhibit L (Resume of Clover Nolasco).[1]

2.     As a Buyer in DuPont's procurement department, Ms. Nolasco's responsibilities included purchasing necessary goods and materials for the plant. Trial Tr. (vol. 2) 11:22 – 12:4; Pl.'s Trial Ex. L.

3.     From 2007 to 2016, Ms. Nolasco worked as a Warehouse and Customer Service Manager for DuPont, which had been renamed DSI Underground. Trial Tr. (vol. 2) 12:14-23; Pl.'s Trial Ex. L.

---

[1] The transcript from the proceedings that took place on July 30, 2024 is identified throughout as Volume One, and the transcript of the proceedings from November 12, 2024 as Volume Two.

4.      As a Warehouse and Customer Service Manager, Ms. Nolasco performed all procurement responsibilities at the warehouse she managed. Ms. Nolasco managed fourteen employees in this role, for whom she completed performance evaluations and bore responsibility for hiring and firing. Trial Tr. (vol. 2) 14:7-21; 15:6-12; Pl.'s Trial Ex. L.

5.      Ms. Nolasco earned a certificate in Business Operations from Blue Ridge Community and Technical College in August 2018. Trial Tr. (vol. 2) 16:14-21; Pl.'s Trial Ex. L.

6.      In addition to this experience, Ms. Nolasco completed training related to procurement that included a course on the fundamentals of importing certificates, as well as Lean Manufacturing Six Sigma training. Trial Tr. (vol. 2) 10:2-11:14; Pl.'s Trial Ex. L.

***Experience Gained by Ms. Nolasco While Employed at Solaris***

7.      Ms. Nolasco applied to work as a Buyer at Solaris Paper in September 2018 and provided Solaris with a copy of her resume as part of the application process. Trial Tr. (vol. 2) 7:8-13; 17:6-7; 17:20-25.

8.      Mercury Paper hired Ms. Nolasco as a Production Analyst in September 2018. Trial Tr. (vol. 2) 17:6-9. Mercury Paper and Solaris are two of three entities that comprise the Asia Pulp & Paper company, and Ms. Nolasco reported to individuals who worked for both entities. Trial Tr. (vol. 2) 48:9 – 49:22; 163:16-18.

9.      In or around October 2018, Solaris transferred Ms. Nolasco to the position of Buyer in the company's Procurement Department, a role she performed under the supervision of Andre Soetjahja ("Mr. Soetjahja"). Trial Tr. (vol. 2) 17:10-25; 18:21 – 19:1.

10.     Ms. Nolasco's responsibilities as a Buyer at Solaris included collecting and analyzing quotes, identifying possible suppliers, and following up with suppliers to resolve any

discrepancies related to quantity, quality, price, or purchase terms. Trial Tr. 18:6-10 (vol. 2); Pl.'s Trial Ex. U (Buyer Job Description).

11.     The education and experience required of the Buyer position included the possession of an Associate degree and 1-3 years of experience in purchasing or a related field. Pl.'s Trial Ex. U.

12.     Ms. Nolasco completed the coursework required to earn her professional procurement certification in June 2020 to prepare her for the Senior Buyer position. Trial Tr. (vol. 2) 23:1-14.

13.     Ms. Nolasco began in her position as Senior Buyer in or around September 2020, a role she performed under the supervision of Sheila Young-Chan ("Ms. Chan"), Head of Procurement. Trial Tr. (vol. 2) 23:18-21; 24:15-20.

14.     Ms. Nolasco's additional responsibilities as a Senior Buyer included identification of possible suppliers and vendors, negotiation with suppliers and evaluation of their capabilities, and the supervision of one or more Buyers. Pl.'s Trial Tr. (vol. 2) 24:3-12. Pl.'s Trial Ex. V (Senior Buyer Job Description).

15.     The education and experience required of the Buyer position included the possession of an Associate degree and 3-5 years of experience in purchasing or a related field. Pl.'s Trial Ex. V.[2]

---

[2] Ms. Farnham testified to the existence of position descriptions for positions at both Mercury Paper and Solaris. Trial Tr. (vol. 2) 131:1-25; Def.'s Trial Ex. 18, p. 2 (providing the company maintains a copy of records for each employee setting forth their job description).

The policy for maintaining personnel files is set forth in Solaris' Employee Handbook. Def.'s Trial Ex. 13 at 9. Solaris could not produce a position description for the role of Head of Procurement laying out the roles, responsibilities, education and experience required for the position. Nor could it produce a position description for Technical Manager — the position previously held by Ms. Hung — setting forth the responsibilities attendant to the position.

16.     Ms. Nolasco supervised two Buyers while she held the role of Senior Buyer. Trial Tr. (vol. 1) at 15:10-17; Trial Tr. (vol. 2) 24:23 – 24:1; Pl.'s Trial Ex. V.

17.     Ms. Nolasco completed performance evaluations for the Buyers she supervised and trained them on Solaris' SOP, its SAP procurement system, and all the modules within SAP about Solaris' products. Ms. Nolasco taught her direct reports about the vendors and the responsibilities of their position as Buyer, generally. Trial Tr. (vol. 2) 25:5-21.

18.     During a conversation with Mr. Soetjaha and Ms. Chan about Ms. Nolasco's career trajectory, Ms. Nolasco learned she would be developed to serve as Ms. Chan's successor in the Head of Procurement role. Trial Tr. (vol. 2) 25:22 – 26:13.

19.     Ms. Chan began training Ms. Nolasco to assume her role as Head of Procurement beginning in 2019, and this training included the handling of raw materials and spare parts as well as the completion of contracts and vendor management. Trial Tr. (vol. 1) 18:17-20; 21:1-3; Trial Tr. (vol. 2) 27:3-13; Pl.'s Ex. I (2020 Performance Evaluation for Clover Nolasco).

20.     Ms. Chan completed Ms. Nolasco's performance evaluations while Ms. Nolasco held the role of Senior Buyer. Ms. Chan selected Ms. Nolasco to succeed her because she was the top employee in the procurement department. Trial Tr. (vol. 1) 12:9-21; 13:11-14; Pl.'s Trial Ex. I.

21.     In 2019, Ms. Chan formally named Ms. Nolasco as her successor. Ms. Chan made this decision with the consideration and approval of Solaris Human Resources and with the consideration and approval of the CEO of Solaris who preceded Mr. Chin-Bing. Trial Tr. (vol. 1) 16:11-17:1; 18:17-20.

22.     In her review of Ms. Nolasco's performance in 2020, Ms. Chan rated Ms. Nolasco a "6" in several categories, the top possible rating. These ratings signified that her performance

exceeded the normal/standard job requirements in the following areas: Quality of work; Productivity; Team Work; Behavior & Reliability; and Leadership. Trial Tr. (vol. 1) 12:9-21; Pl.'s Trial Ex. I.

23. In the comments to Ms. Nolasco's 2020 performance evaluation, Ms. Chan wrote, "For 2021, this is the year of learning direct material, base paper, and finished goods to be my successor." Trial Tr. (vol. 1) 12:9-21; Pl.'s Trial Ex. I at 3.

***Vacancy of Head of Procurement Position***

24. On February 26, 2022, Ms. Chan announced her voluntary resignation from employment with Solaris as Head of Procurement. Trial Tr. (vol. 1) 19:21-22.

25. On a call with Mr. Chin-Bing on that same date, Ms. Chan informed Solaris CEO David Chin-Bing ("Mr. Chin-Bing") that she had named and trained Ms. Nolasco to succeed her in the Head of Procurement role. Trial Tr. (vol. 1) 21:1-12.

26. Ms. Chan informed Ms. Farnham of the same on a separate call on the same date. Trial Tr. (vol. 1) 30:6-14; Trial Tr. (vol. 2) 114:2-6.

27. On March 2, 2022, Ms. Chan visited Mr. Chin-Bing in his office and recommended that Ms. Nolasco take her place as Head of Procurement. Trial Tr. (vol. 1) 21:22 – 22:24.

28. Mr. Chin-Bing informed Ms. Chan that he did not think Solaris headquarters would support the promotion of Ms. Nolasco. Rather, they were considering Ms. Hung for the position based on management's preference for an individual who is Asian. Trial Tr. (vol. 1) 22:15-24.

29. On or about March 3, 2022, Ms. Chan recommended to Mr. Chin-Bing and Shelley Farnham ("Ms. Farnham"), Vice-President of Human Resources, that Ms. Nolasco

succeed her as Head of Procurement. Trial Tr. (vol. 1) 27:20 – 28:3; 36:2-21; Trial Tr. (vol. 2) 30:1-8; Pl.'s Trial Ex. C.

30.    Ms. Chan's recommendation included:

(a) A description of Ms. Nolasco's qualifications and history of training relevant to the position;

(b) Discussion of Ms. Nolasco's prior accomplishments at Solaris, including "previous experiences, cost savings projects and process improvement that [Ms. Nolasco] completed in 2018-2021";

(c) A copy of Ms. Nolasco's resume supporting her experience and qualifications;

(d) A detailed plan and organizational chart for the Procurement Department under the supervision of Ms. Nolasco.

Trial Tr. (vol. 1) 27:20 – 28:3; 36:2-21; Trial Tr. (vol. 2) 30:1-8; Pl.'s Trial Ex. C.

31.    On the same day that Ms. Chan recommended Ms. Nolasco to Mr. Chin-Bing and Ms. Farnham, Ms. Chan announced Ms. Nolasco would succeed her as Head of Procurement to the procurement department during a team meeting. Trial Tr. (vol. 1) 25:17-22; Trial Tr. (vol. 2) 29:13-21.

### *Qualifications Attendant to the Head of Procurement Position*

32.    On March 3, 2024, Ms. Farnham drafted a Manpower Request Form setting forth the qualifications required of candidates seeking the vacant position of Head of Procurement previously held by Ms. Chan. Trial Tr. (vol. 2) 96:25 – 97:2; 99:2-7; 121:12-15; Pl.'s Trial Ex. A (Manpower Request Form). Solaris' policy related to promotions and transfers provides that eligibility for an open position requires that an employee meet the qualifications listed on the job posting. Def.'s Trial Ex. 13 at p. 18.

33.     Mr. Chin-Bing signed the Manpower Request Form created for the Head of Procurement position after verifying the accuracy of the information contained therein. Trial Tr. (vol. 2) 97:6-12; 98:16-22; 101:3-5.

34.     The qualifications of candidates for the Head of Procurement position set forth in the Manpower Request Form are as follows:

     a.   Bachelor's degree in Business preferred;

     b.   5 years of procurement experience strongly preferred;

     c.   Management experience required;

     d.   Certificate in procurement nice to have; and

     e.   Must have "attention to detail, process, follow-up and documentation."

Pl.'s Trial Ex. A.

### *Ms. Nolasco's Superior Qualifications for the Head of Procurement Position*

35.     <u>Bachelors Degree in Business Preferred</u>. Ms. Nolasco holds a certificate degree in Business Operations, Trial Tr. (vol. 2) 16:14-21; Pl.'s Trial Ex. L.  Ms. Hung holds a Bachelor's degree in Graphic Design. Trial Tr. (vol. 2) 129:1-2.

36.     <u>Management Experience Required</u>. Ms. Nolasco had nine (9) total years of experience in management, including management of fourteen (14) direct reports in her former position and 1-2 years managing two (2) employees in her position of Senior Buyer at Solaris. Trial Tr. (vol. 2) 14:7-21; 23:18-21; 24:23 – 25:1; Pl.'s Trial Ex. C, L, and V.

37.     Ms. Hung had no management experience prior to her employment at Solaris, and

had either two (2) or (3) direct reports in her position as Technical Manager at Solaris. Trial Tr.

(vol. 2) 128:8-12; 129:21 – 130:4; 176:20-25.[3]

38.     <u>Must Have Attention to Detail, Process, Follow-up and Documentation</u>. Ms.

Nolasco's performance evaluations evidence that she excelled in the competencies of attention to

detail, follow-up, documentation and processes. Pl.'s Trial Ex. I.  The skills and abilities required

of Ms. Nolasco's position as Senior Buyer included, in relevant part: (1) good analytical skills

and attention to detail for vendor comparison; (2) leadership skills; and (3) good organizational

skills, document control, and filing. Trial Tr. (vol. 2) 24:3-12; Pl.'s Trial Ex. V.

39.     Whether Ms. Hung possesses these competencies is unknown, as Solaris did not

review Ms. Hung's performance evaluations or otherwise document her performance beyond the

letter rating afforded to her annually by the company. Trial Tr. (vol. 2) 135:9-15.

40.     Although Ms. Farnham testified at trial that she completed the Employee Status

Change Request form for Ms. Hung, which includes a recitation of Ms. Hung's performance

grades from 2018, 2019, and 2020, Ms. Farnham admitted she did not review those performance

reviews personally; instead, she took those ratings from a spreadsheet. Trial Tr. (vol. 2) 134:4 –

135:1; 135:13-15; Pl.'s Trial Ex. D.[4]

---

[3] Although Mr. Chin-Bing testified to the length of Ms. Hung's tenure in the Technical Manager position at Solaris, he later admitted that he did not have personal knowledge of Ms. Hung's work at Solaris prior to his arrival at the company in 2020, nor did he learn of her tenure through review of documents. Trial Tr. (vol. 2) 184:19-25.

[4] Notably, Ms. Farnham's trial testimony represented the first time Plaintiff learned of such a spreadsheet, a document which would have unambiguously been responsive to Plaintiff's Requests for Production. At Ms. Farnham's deposition, she testified that she read Ms. Hung's performance reviews to complete the Employee Status Change Request Form. As a result, Plaintiff did not know to request this spreadsheet.

With that said, this Court compelled Defendant to produce any such documents. (Dkt. 29). This

9

41. <u>Five Years of Procurement Experience Strongly Preferred</u>. Ms. Nolasco worked in the Procurement Department for four (4) years while employed by Solaris. Trial Tr. (vol. 2) 11:15-25; Pl.'s Trial Ex. C. Her procurement experience included an additional six (6) years of experience in purchasing, negotiation, cost savings, and contract administration prior to the start of her employment with Solaris. Trial Tr. (vol. 2) 130:5-7; Pl.'s Trial Ex. C, L.

42. Ms. Hung did not have any procurement experience. Trial Tr. (vol. 2) 45:20 – 46:7; 129:3-15.

43. <u>Certificate in Procurement Nice to Have</u>. Ms. Nolasco had a professional procurement certificate. Trial Tr. (vol. 1) 18:9-16. Ms. Hung did not have a professional procurement certificate. Trial Tr. (vol. 2) 45:20 – 46:7; 129:16-18.

***Ms. Chan Learns of Solaris' Selection of Camil Hung as Head of Procurement.***

44. Ms. Chan spoke to Ms. Farnham on the phone regarding Ms. Nolasco's non-selection on or about March 6, 2022. On this date, Ms. Chan asked Ms. Farnham directly why Ms. Hung was selected over Ms. Nolasco; Ms. Farnham stated that Ms. Hung was selected because she is Asian. Specifically, Ms. Farnham stated that Ms. Nolasco had checked off all of the boxes for the position except for one: Ms. Nolasco is not Asian. Trial Tr. (vol. 1) 30:17-25.

45. Although Ms. Farnham drafted, and Mr. Chin-Bing signed, a Manpower Request Form to replace Ms. Chan just four days earlier, Defendant announced to all employees that Ms. Hung would be promoted on March 7, 2022. Pl.'s Trial Ex. A; Pl.'s Trial Ex. PP.

46. Although Solaris has maintained that it promoted Ms. Hung into a different position than the one previously filled by Ms. Chan, David Chin-Bing testified at trial that there

Order included discovery requests that would require the production of both Ms. Hung's performance reviews and the spreadsheet to which Ms. Farnham referred at trial.

was only one position in procurement that Solaris sought to fill in March 2022. Regardless of that position's title, there is no doubt that Ms. Nolasco and Ms. Hung sought the same position. Trial Tr. (vol. 2) 96:6-17.

47.     The Manpower Request Form states that Solaris sough to seek a Senior Manager Procurement position. On that same document, handwritten notes indicate that Solaris changed the position from Procurement Head to Sr. Procurement Manager. Pl.'s Trial Ex. A

48.     On or about March 7, 2022, Ms. Chan informed Ms. Nolasco of Solaris' decision to promote Ms. Hung rather than her to the Head of Procurement position. Trial Tr. (vol. 1) 31:3-10; Trial Tr. (vol. 2) 32:11-33:5.

49.     Ms. Chan informed Ms. Nolasco that Solaris selected Ms. Hung for the position. When Ms. Nolasco inquired as to the reason, Ms. Chan told her it is because she did not have "chinky eyes." Trial Tr. (vol. 1) 31:3-14.  Ms. Chan remained employed by Solaris at the time she made this statement to Ms. Nolasco. Trial Tr. (vol. 1) 31:18 – 32:2.

50.     By this comment, Ms. Chan meant that Solaris selected Ms. Hung over Ms. Nolasco because Ms. Hung is Asian and Ms. Nolasco is not. Trial Tr. (vol. 1) 31:8-13; Trial Tr. (vol. 2) 33:1-5.

51.     Ms. Chan spoke to Ms. Hung about her selection for the Head of Procurement position, and Ms. Hung told Ms. Chan she had not been interested in the position but had been "volunteered" to accept it. Trial Tr. (vol. 1) 33:13 – 34:5.

52.     Ms. Chan addressed the issue for a final time during her exit interview with Mr. Chin-Bing on March 11, 2022. Once again, Mr. Chin-Bing informed Ms. Chan that he selected Ms. Hung to be Head of Procurement because Ms. Hung is Asian. Trial Tr. (vol. 1) 42:23 – 43:19.

53.     At no time did Mr. Chin-Bing tell Ms. Chan that the selection of Ms. Hung occurred because Ms. Nolasco is located in Virginia rather than California, because of Ms. Hung's tenure at Solaris, or because of any deficiencies in her work performance. Trial Tr. (vol. 1) 39:19 -40:12.

54.     At no time did anyone at Solaris told Ms. Chan that the selection of Ms. Hung occurred because Ms. Nolasco is located in Virginia rather than California, because of Ms. Nolasco's education level, or because of Ms. Nolasco's qualifications for the position. Trial Tr. (vol. 1) 40:13 – 41:3.

***Ms. Nolasco Speaks to Human Resources About Her Non-Selection.***

55.     On or about March 7, 2022, Ms. Nolasco had a conversation with Head of Human Resources Ms. Farnham and Human Resources employee Christy Lingham about her non-selection for the Head of Procurement position. Trial Tr. (vol. 2) 36:24 – 37:6.

56.     Ms. Farnham informed Ms. Nolasco during this call that Solaris did not select her for the position because she did not have a Bachelor's degree and did not reside in California. Trial Tr. (vol. 2) 37:18 – 38:1.

57.     On that same date, Ms. Nolasco complained to Ms. Farnham and Ms. Lingham via email about her belief she had not been selected for the position due to discrimination based on her race and national origin. Trial Tr. (vol. 2) 39:3-16; 140:15 – 141:2; Pl.'s Trial Ex. F.

58.     Ms. Farnham responded to Ms. Nolasco via email, in which she provided Solaris had selected Ms. Hung based on her location in California and based on her "contributions, skills, and managerial experience at Solaris." Pl.'s Ex. E.

59.     Ms. Farnham did not refer Ms. Nolasco to an EEO policy or direct her toward a complaint process for reporting discrimination at Solaris. Trial Tr. (vol. 2) 40:4-14; 141:6-17.

60.     Solaris did not take any action to investigate Ms. Nolasco's complaints of discrimination. Trial Tr. (vol. 2) 141:6-10.

***Ms. Nolasco Speaks to Mr. Chin-Bing About Her Non-Selection.***

61.     Ms. Nolasco spoke to Mr. Chin-Bing on the phone following her non-selection for the Head of Procurement position, on or about March 9, 2022. Trial Tr. (vol. 2) 41:17-25.

62.     On this call, Mr. Chin-Bing raised Ms. Nolasco's complaint to Human Resources that her non-selection arose due to discrimination based on her race and national origin. Trial Tr. (vol. 2) 42:8-16.

63.     Mr. Chin-Bing became upset with Ms. Nolasco during this call and instructed her not to call the action discriminatory. Mr. Chin-Bing mocked her belief that she had been discriminated against, and added on behalf of Solaris, "we like the white people." Trial Tr. (vol. 2) 42:8-16.

64.     Mr. Chin-Bing offered to "look into" a raise for Ms. Nolasco and instructed her to teach and train Ms. Hung to perform the Head of Procurement Position. Trial Tr. (vol. 2) 42:20 – 43:7.

65.     Mr. Chin-Bing testified to not knowing about Ms. Nolasco's complaint of discrimination when he spoke with her about her non-selection on March 9, 2024, and not learning of the complaint until 2-3 months after Ms. Nolasco resigned. Trial Tr. (vol. 2) 180:5-7; 180:17 – 181:7.

66.     Mr. Chin-Bing later contradicted this testimony by stating that discussion of race and Ms. Nolasco's non-selection for the Head of Procurement arose during Ms. Chan's exit interview on or about March 11, 2022. Trial Tr. (vol. 2) 192:24 – 193:15.

67. Mr. Chin-Bing did not investigate Ms. Chan's complaint of discrimination or speak to anyone else about it at any time, despite his knowledge and training on Solaris' EEO policy. Trial Tr. (vol. 2) 186:3-16; 195:10-24.

68. Mr. Chin-Bing testified to not having conducted an investigation because Ms. Chan was leaving the company. This is in direct contradiction of Solaris' EEO policy which provides "[a]pplicants and employees are encouraged to report concerns even if they relate to incidents in the past, involve individuals no longer affiliated with the Company. . .". Trial Tr. (vol. 2) 195:10-24; Def.'s Trial Ex. 13.

***Ms. Nolasco Restates Her Complaint of Discrimination During Her Exit Interview.***

69. Ms. Nolasco cited discrimination based on her national origin and race as the reason for her resignation during her exit interview on or about April 8, 2022. Trial Tr. (vol. 2) 50:15-17. Ms. Nolasco did not receive any response to her complaint from Solaris. Trial Tr. (vol. 2) 50:15-25.

70. Both Ms. Farnham and Mr. Chin-Bing testified as to their knowledge of the EEO policies at the company prohibiting employment decisions based on the race of its employees. Trial Tr. (vol. 2) 145:7 – 148:23; 186:7-16; Def.'s Trial Ex. 13; 18.

71. Solaris' EEO policy provides that after a report of discrimination is received, "the Company will conduct a fair, timely, thorough, and objective investigation that provides all parties appropriate due process and reaches reasonable conclusions based on the evidence collected." Def.'s Trial Ex. 13.

***Explanations Provided by Solaris at Trial for Ms. Nolasco's Non-Selection***

72. Ms. Farnham testified for the first time at trial that she decided Ms. Nolasco was not qualified for the Head of Procurement position because she did not have in-company managerial experience. Trial Tr. (vol. 2) 117:18-22.

73.     Ms. Farnham also testified for the first time at trial that Solaris completed a preliminary review of all individuals employed in its procurement department and determined that no one within the department — including Ms. Nolasco — held the qualifications required of the position. Trial Tr. (vol. 2) 117:10-13. She testified that no documentation of this review exists. Trial Tr. (vol. 2) 125:4-6.

74.     In-company management experience is not one of the qualifications listed for the position in the Manpower Request Form. Trial. Tr. (vol. 2) 122:12-14; Trial Ex. A.

75.     Ms. Farnham and Mr. Chin-Bing both testified that Solaris did not select Ms. Nolasco because the position was based in California and Ms. Nolasco resided in Virginia. Trial Tr. (vol. 2) 103:9-15; 118:16-19.

76.     No one at Solaris asked either Ms. Nolasco or Ms. Chan if Ms. Nolasco would be willing to relocate to California for the position. Trial Tr. (vol. 1) 39:16-23; Trial Tr. (vol. 2) 35:13-15; 178:19-21.

77.     The Manpower Request form does not provide that the position must be performed in California. Trial. Tr. (vol. 2) 100:20-22; 124:6-8; Trial Ex. A. To the contrary, the form specifies the Head of Procurement position can be performed on either the east or west coast. Trial Tr. (vol. 2) 100:20-22; 124:6-8; Pl.'s Trial Ex. A.

78.     Ms. Farnham and Mr. Chin-Bing both testified that Solaris did not select Ms. Nolasco because Ms. Hung had a longer tenure with the company. Trial. Tr. (vol. 2) 161:25 – 162:5; 191:19-22.

79.     Ms. Farnham and Mr. Chin-Bing both testified that Solaris did not select Ms. Nolasco because Ms. Hung had evidenced a greater attention to detail and processes at Solaris. Trial Tr. (vol. 2) 102:15 – 103:8; 162:22 – 163:1.

80.     Ms. Farnham testified that she did not review performance evaluations for either Ms. Nolasco or Ms. Hung or engage in any attempt to evaluate her strengths and weaknesses in these particular areas. Trial Tr. (vol. 2) 134:24 – 135:1; 158:13-21.

***Ms. Nolasco's Resignation, Notice Period, and New Employment***

81.     Ms. Nolasco informed Solaris she intended to resign on March 7, 2022 based on Solaris' discriminatory decision not to promote her because of her race. Pl.'s Trial Ex. F. Prior to Solaris' failure to promote her, Ms. Nolasco had intended to stay with the company until her retirement. Trial Tr. (vol. 2) 53:6-17.

82.     Ms. Nolasco continued working through April 8, 2022 — a period of approximately five weeks in order to conclude a significant project on which she had been working for Solaris. During this time, Ms. Nolasco also trained Ms. Hung to take over the Head of Procurement position, continued her training of a new Buyer, and interviewed applicants to fill her position as Senior Buyer. Trial Tr. (vol. 2) 44:14 – 45:15.

83.     Approximately four weeks after her resignation, Ms. Nolasco secured new employment at a different company as a Senior Buyer with starting pay of $75,000.00 annually. Ms. Nolasco is currently employed as a Procurement Manager making twice the annual salary she earned while employed at Solaris. Trial Tr. (vol. 2) 53:18 – 55:7.

84.     Ms. Nolasco testified to having proceeded with litigation regardless of her earning more in her new position based on principle and her need to "start over" after Solaris derailed the career plan she had worked toward for years. Trial Tr. (vol. 2) 55:8-17.

***The Impact of Solaris' Actions on Ms. Nolasco.***

85.     Ms. Nolasco earned an annual salary of approximately $64,000.00. Trial Tr. (vol. 2) 42:20-21.

86.     Solaris increased Ms. Hung's salary to $120,131.00 upon her selection for the Head of Procurement position, a 29% raise. Trial Tr. (vol. 2) 138:7-9; Trial Ex. E.

87.     Solaris offered Ms. Hung a performance bonus of $15,000.00 as an incentive for her to accept the Head of Procurement position. Trial Tr. (vol. 2) 138:21 – 139:4; Trial Ex. E.

88.     Following Solaris' non-selection of Ms. Nolasco as Head of Procurement, Ms. Nolasco experienced significant mental and emotional distress. Trial Tr. (vol. 2) 55:18 – 57:2 Ms. Nolasco testified to having felt "very, very shocked" and very upset upon learning she had not been selected for the position. Trial Tr. (vol. 2) 32:11-24; 33:9-18. She testified to having loved the company and the work that she performed and to the difficulty of the ensuing conversations surrounding her non-selection with both Ms. Farnham and Mr. Chin-Bing. Trial Tr. (vol. 2) 36:11-20; 37:21 – 38:1; 42-43; 178:19 – 179:6.

89.     Ms. Nolasco testified that because of Solaris' non-selection of her for the position, "all of a sudden, my world crashed, really quick." Trial Tr. (vol. 2) 55:21 – 56:3. She testified as to her humiliation and her feeling of not being valued despite her years of hard work for the company. Trial Tr. (vol. 2) 55:21 – 56:10.

90.     Ms. Nolasco mourned the loss of relationships she had worked hard to build both inside and outside of the company, became isolated, and cried often. Trial Tr. (vol. 2) 56:11-15. She described finding it difficult to function in her day-to-day-life and missing valuable opportunities to spend time with her grandchildren based on the emotional toll of Solaris' actions. Trial Tr. (vol. 2) 56:22 – 57:2.

91.     Ms. Nolasco suffered physical manifestations of that emotional distress, including severe headaches and her hair falling out in clumps. Trial Tr. (vol. 2) 56:11-21.

92.     Ms. Chan's testimony supported the emotional distress described by Ms. Nolasco. Trial Tr. (vol. 1) 32:4-10. Ms. Chan testified that, upon learning of her non-selection, Ms. Nolasco became frustrated and angry, and that Ms. Chan felt compelled to testify against Solaris based on an ethical duty and moral obligation. Trial Tr. (vol. 1) 32:4-10; 44:5-15.

## II.     PROPOSED CONCLUSIONS OF LAW AS TO LIABILITY

As stated plainly and directly by the Head of Human Resources for Solaris and its CEO, Solaris' selection of Ms. Hung over Ms. Nolasco for the role of Senior Procurement Manager occurred based on the respective races of the candidates. These actions were carried out by the Vice President of Human Resources and Solaris' CEO: two executive-level individuals who were fully conscious of the illegality of making employment decisions based on the protected characteristics of its employees. Both the direct and circumstantial evidence of discrimination presented at trial require a finding of liability against Solaris for its failure to promote Ms. Nolasco to the Senior Procurement Manager position based on her race (Caucasian) in violation of Title VII.

### A.     Direct Evidence of Race-Based Discrimination

On at least four different occasions and through at least three different high-level employees, Solaris expressly stated that it selected Ms. Hung over Ms. Nolasco as Head of Procurement based solely on the race of the respective candidates. Put simply: Solaris selected Ms. Hung for the position because she is Asian and Ms. Nolasco is not.

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Va. Union Univ.,* 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*), abrogated on other grounds by *Desert Palace, Inc. v. Costa*, 589 U.S. 90, 98 (2003). "Direct evidence is evidence

that the employer 'announced, or admitted, or otherwise unmistakably indicated that [race and/or national origin] was a determining fact' in the particular employment action." *Marlow v. Chesterfield Cnty. Sch. Bd.*, 749 F. Supp. 2d 417, 427 (E.D. Va. 2010) (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)).

On March 2, 2024, Mr. Chin-Bing told Ms. Chan that Ms. Nolasco's race — particularly the fact that she is not Asian — would make her promotion at the company unlikely. On March 7, 2024, Ms. Farnham told Ms. Chan that Ms. Nolasco "checked all the boxes" for the position, but that Solaris selected Ms. Hung instead because Ms. Nolasco is not Asian. On March 7, 2024, Ms. Chan — still employed by Solaris and still serving in the position of Ms. Nolasco's supervisor — informed Ms. Nolasco she had not been selected to be Head of Procurement because of her race. Finally, when Ms. Chan inquired with Mr. Chin-Bing about his selection of Ms. Hung instead of Ms. Nolasco on a subsequent occasion, Mr. Chin-Bing confirmed that he had selected Ms. Hung because she is Asian and Ms. Nolasco is not. These statements are direct evidence of discrimination.

The single factor that proved determinative in Solaris' decision to choose Ms. Hung over Ms. Nolasco was the race of the respective candidates. An employer's classification of an employee's eligibility for a position based on race establishes intent without regard to the decisionmaker's animus or ultimate objective and demonstrates a discriminatory purpose as a matter of law. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 904-05 (1995).

### C.  Circumstantial Evidence of Race and National Origin Based Discrimination

In addition to direct evidence, Ms. Nolasco presented substantial circumstantial evidence at trial that supports a finding of an inference of discrimination against Solaris. To state a claim of failure to promote using circumstantial evidence, a plaintiff must demonstrate that: (1) she is a

member of a protected class; (2) she applied for the position in question; (3) she was qualified for that position; and (4) the employer rejected her application under circumstances that give rise to an inference of unlawful discrimination. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005).

Ms. Nolasco is a member of two protected classes on account of her race (Caucasian) and national origin (American). She expressed her interest in the Head of Procurement position, trained for the position, and held all qualifications required of the position.

An inference of discrimination can be established through several means. In addition to "comparing the plaintiff's qualifications with those of the person who received the promotion," a court may "consider the veracity of the reasons annunciated by the employer, why the plaintiff did not receive the promotion." *Anderson*, 406 F.3d 248 at 269 (citing *Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 648-49, n.4 (4th Cir. 2002)).

As demonstrated at trial, Ms. Nolasco is significantly more qualified than Ms. Hung with respect to all qualification criteria, and there is substantial reason to doubt the veracity of the explanations provided by Solaris for its non-selection of Ms. Nolasco for the Head of Procurement position.[5] Further, Solaris maintains a policy related to promotions and transfers which provides, to be eligible for an open position, a candidate "*must* meet the job qualifications listed on the job posting." Def.'s Trial Ex. 13 at 18 (emphasis added). Ms. Hung did not meet the job qualifications listed by Solaris at the time of her selection, as she did not have five years of procurement experience.

A trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation of its decision to promote one employee over another. *Dennis*, 290 F.3d

---

[5] *See* comparison of qualifications provided in the Proposed Findings of Fact, *supra*.

at 639, 648, n.4; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). "In appropriate circumstances, the trier of fact may reasonably infer from the falsity of an explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147.

Solaris contended at trial that it did not select Ms. Nolasco to be Head of Procurement because she did not have in-company management experience. This is untrue. It contended that it did not select Ms. Nolasco for the position because she was not willing to relocate to California. This is untrue. Solaris provided Ms. Hung possessed superior qualifications in the areas of attention to detail, processes and documentation: this too, is false.

"When asked to justify an employment decision, an employer may not provide post-hoc rationalizations and claim that they are the actual criteria on which the decision was based. *Holley v. North Carolina Dept. of Admin., N.C.*, 846 F.Supp.2d 416, 436 (4th Cir. 2012) (citing *Dennis*, 290 F.3d at 646-67 & n.2). All of the explanations provided by Solaris at trial arose only after Solaris' non-selection of Ms. Nolasco for the position and were not included in the requisition document for the position.

Ms. Farnham testified for the first time at trial that Ms. Nolasco lacked the in-company management experience for the position, and provided explanations to Ms. Nolasco based on education and location for the first time on March 7, 2022 after the company had already announced that Ms. Hung would fill the role. These explanations are also contradicted by the requisition document produced by Solaris, which provides only a preference (rather than a requirement) for a Bachelor's degree in business and states the position may be filled by an individual on either the east or west coast.

Finally, these explanations appear inconsistent with the timeline. Ms. Farnham drafted the Manpower Request Form, and David Chin-Bing approved it, only four days before Ms. Hung's promotion was announced. It simply strains credulity to believe that Solaris sought qualifications for the Senior Procurement Manager position that it did not consider and include on the requisition form just four days earlier.

## III.   PROPOSED CONCLUSIONS OF LAW AS TO DAMAGES

### A.  Ms. Nolasco's Entitlement to Back Pay

The United States Supreme Court has recognized the "reasonably certain prospect of a backpay award," to "make whole" victims of intentional discrimination by restoring by restoring them so far as possible to a position where they would have been were it not for the unlawful discrimination." *Moody v. Albemarle Paper Co.*, 422 U.S. 405, 417-18 (1975). Ms. Nolasco is entitled to back pay to compensate her for the wages and benefits she would have earned between March 1, 2022 and April 8, 2022, the last date of her employment at Solaris, if not for its failure to promote her to the position of Head of Procurement.[6]

Ms. Nolasco earned $64,000.00 annually (approximately $1,280.00 weekly), while Ms. Hung earned $120,131.00 annually (approximately $2,402.62 weekly) following her promotion to Head of Procurement. Had Solaris selected Ms. Nolasco for promotion, she would have earned an additional $1122.62 per each of the remaining six (6) weeks of her employment, or $6,735.72 total. As a result, Ms. Nolasco is entitled to back pay in the amount of $6,735.72.

---

[6] Ms. Hung's Employee Status Change form provides that the change in her salary had been backdated to March 1, 2022. Pl.'s Trial Ex. E. Ms. Nolasco testified to her last day of work being April 8, 2022. Trial Tr. (vol. 2) 44:14-17.

A plaintiff is also entitled to prejudgment interest at the prime rate of interest. *Norfolk & Portsmouth Belt Line R. R. Co. v. M/V Marlin*, 2:08-cv-134, 2009 U.S. Dist. LEXIS 104327 (E.D. Va. 2009). Ms. Nolasco is entitled to prejudgment interest on the wages and benefits awarded to her based on the prime rate of interest.

## B. Ms. Nolasco's Entitlement to Compensatory Damages

A plaintiff shall be awarded compensatory damages under Title VII upon a showing that as a direct or proximate cause of the discriminatory or retaliatory action she experienced "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). A plaintiff's testimony alone can support an award of compensatory damages for emotional distress. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546 (4th Cir. 2003).

The Fourth Circuit has previously acknowledged that "the victim of race discrimination suffers humiliation, attack on self-esteem, loss of sense of personal accomplishment, and diminished enthusiasm for work." *Pine Ridge Coal Co. v. Local 8377*, *United Mine Workers of America*, 187 F.3d 415, 421 (4th Cir. 1999). As she testified at trial, Ms. Nolasco experienced significant pain and suffering because of the loss of opportunity for career advancement at Solaris that she had worked toward and prepared for years to obtain. After her non-promotion to the position, Ms. Nolasco experienced symptoms of depression, stress, and anxiety that included severe headaches and hair loss. Ms. Nolasco missed opportunities to spend time with her family, including several weekends with her grandchildren, based on these symptoms.

Comparisons between similar cases may be used to determine the appropriate range for an award of compensatory damages. *Earl v. Bouchard Transportation Co., Inc.*, 917 F.2d 1320, 1328 (2d Cir. 1990). Although highly fact-specific, compensatory damages awarded in similar

cases is illustrative of the appropriate range of compensatory damages for purposes of the instant matter.

In *Bryant*, the plaintiff testified to having been "embarrassed," "frustrated and angry," "very disgusted," and that she "didn't feel very good about coming to work." Further, she described certain physical symptoms she developed related to the distress she felt but testified that she didn't seek medical help. *Bryant*, 333 F.3d at 547. The Fourth Circuit held that the plaintiff's response had been reasonable given the situation in which she found herself, and the fact that she had not sought medical treatment did not minimize her emotional distress. *Id.*

In *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 439 (4th Cir. 2004), the Fourth Circuit affirmed a $250,000.00 emotional distress award where the plaintiff testified that the emotional distress "had eaten him up inside" and "caused him to lose sleep." Similarly, in *Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 620 (4th Cir. 2007), the Fourth Circuit affirmed the district court's refusal to remit the emotional distress award below the applicable $200,000.00 statutory cap where the plaintiff became "anxious and ill" after being subjected to retaliation after she filed a complaint with the EEOC, finding that this was within the sound discretion of the district court.

In *Peyton v. DiMario*, 287 F.3d 1121, 1128 (D.C. Cir. 2002), the district court awarded $300,000.00 in emotional distress damages in a discrimination and retaliation case where the defendant's conduct "had a material effect upon her ability to perform and her quality of life in the workplace" and "feelings of depression and sadness typical of plaintiffs in Title VII cases." *Id.* The DC Circuit affirmed this award on appeal, finding there was sufficient evidence such that the district court did not abuse its discretion.

In *McDonough v. City of Quincy*, 452 F.3d 8, 22 (1st Cir. 2006), the court affirmed the district courts denial of the defendant's motion to remit the jury's $300,000.00 emotional distress award where the plaintiff testified that the retaliation he endured caused him to suffer humiliation and damage to his reputation, and caused his relationship with his family to suffer.

Ms. Nolasco offered testimony similar to the testimony of the plaintiffs described above, and an award of compensatory damages to her in the amount of $300,000.00 is supported by the evidence.

## C. Plaintiff's Entitlement to Punitive Damages

Solaris acted with malice or reckless indifference to Ms. Nolasco's federally protected rights under Title VII in a manner that warrants a finding of punitive damages against the company. This Court may properly find Ms. Nolasco entitled to punitive damages despite Ms. Nolasco having failed to expressly request such damages in the prayer for relief included in her *pro se* Complaint.[7]

> 1. *The Absence of an Express Request for Punitive Damages in Ms. Nolasco's Complaint Does Not Preclude this Court from Finding Punitive Damages are Appropriate.*

"A failure to specifically plead and demand exemplary damages will not bar an award of such damages under 54(c) where the body of the complaint alleges facts sufficient to support the

---

[7] Ms. Nolasco's former counsel terminated representation of Ms. Nolasco days prior to the deadline for filing the Complaint in the instant matter, leaving Ms. Nolasco to file her Complaint *pro se* on November 30, 2023.

The prayer for relief Ms. Nolasco included in her Complaint is a recitation, verbatim, of a settlement proposal contained in a demand letter from Ms. Nolasco's former counsel to Solaris, dated November 26, 2023. This is apparent from the face of the demand letter and the Complaint, both within the possession of Defendant's counsel. It strains credulity for Defendant to believe that Ms. Nolasco's pre-filing settlement proposal represented the full amount of relief to which she would be entitled if judgment were entered in her favor following litigation of her claim.

award." *In re Landbank Equity Corp.*, 83 B.R. 362, 376 (E.D. Va. 1987) (affirming award of punitive damages where complaint was "replete with particularized allegations" of conduct upon which punitive damages could be awarded). Solaris had notice of Ms. Nolasco's entitlement to punitive damages based on the allegations pled in her Complaint.

Although Rule 8 requires a plaintiff include a claim for the relief to which she is entitled, Rule 54(c) provides that a final judgment "grant the relief to which each party is entitled *even if the party has not demanded that relief in its pleadings*." Fed. R. Civ. P. 8; Fed. R. Civ. P. 54(c) (emphasis added); *see also* 6A Wright, Miller & Kane, Federal Practice and Procedure (2d ed. 1990) § 1497, at 85 (stating that amendment of a complaint to increase the amount claimed for relief is permissible albeit unnecessary in light of Rule 54).[8]

Solaris' own filings demonstrate the allegations of Ms. Nolasco's Complaint were sufficient to provide notice to Solaris of her entitlement to punitive damages, and, therefore, allowed Solaris an opportunity to defend itself against the imposition of this form of relief. Solaris' Answer to Ms. Nolasco's Complaint contains *two* affirmative defenses related to punitive damages. Defendant asserted as its Fourth Affirmative Defense that "Plaintiff has failed to allege facts sufficient to state a claim for punitive damages," and states as its Ninth Affirmative Defense that "Plaintiff cannot recover punitive damages for any alleged

---

[8] *See also Bowles v. Osmose Utils. Servs.*, 443 F.3d 671, 675 (8th Cir. 2006) (affirming trial court's award of punitive damages pursuant to Rule 54(c) where complaint did not call for punitive damages but defendant had notice of plaintiff's intent to seek them prior to trial); *Scutieri v. Page*, 808 F.2d 785, 790-793 (11th Cir. 1987) (holding a specific request for punitive damages in a complaint was not necessary where complaint alleged conduct that would support a claim for such relief); *Guillen v. Kuykendall*, 470 F.2d 745, 748 (5th Cir. 1972) (finding trial court erred in not instructing jury regarding exemplary damages where the complaint contained allegations that would support such relief but did not include an explicit request for exemplary damages).

discrimination because any such alleged discrimination would be contrary to Defendant's good faith efforts to comply with laws governing such conduct." Answer (Dkt. 6) at 3-4.[9]

In her initial disclosures to Solaris, exchanged on February 26, 2024, Ms. Nolasco's breakdown of damages included an express statement of her entitlement to $350,000.00 in punitive damages. Solaris maintained its defenses to punitive damages throughout the litigation in this matter. At trial, Defendant spent a significant amount of time reviewing its EEO policies, presumably in support of its argument that it acted in good faith, an argument relevant largely as a defense to punitive damages.

To be sure, the particularized allegations of Ms. Nolasco's Complaint are sufficient to support an award of punitive damages and put Solaris on notice of its need to defend itself with respect to this particular form of relief. Ms. Nolasco alleges in her complaint that she complained of discrimination after Solaris selected Ms. Hung (Taiwanese, Asian) over her for the position of Head of Procurement despite Ms. Hung having no certification or experience in either purchasing or procurement. Compl. at 5.

Ms. Chan informed Ms. Nolasco in no uncertain terms that she had been passed over for promotion because of her race and national origin. *Id.* The CEO of Solaris responded to Ms. Nolasco's subsequent complaint of discrimination by laughing at her for believing she had been discriminated against. *Id.* When confronted with formal charges of discrimination by state and federal administrative agencies, Solaris responded with an explanation for its actions that both Ms. Nolasco and the company knew to be false. *Id.* Finally, Solaris refused to take Ms.

---

[9] *See* Trial Tr. (vol. 2) 145:7 – 148:23. On May 10, 2024, Solaris responded to an interrogatory about its arguments specifically related to damages by referring Plaintiff back to the affirmative defenses listed in its Answer. Pl.'s Proposed Trial Ex. FF, Resp. to Interrog. 6. By the date of this response, Solaris had already filed a Motion for Summary Judgment in this matter. (Dkt. 15, filed April 17, 2024).

Nolasco's allegations seriously during litigation. Obtaining even the limited documents produced by Solaris required significant effort on the part of Ms. Nolasco's attorneys and the intervention of this Court.

Both Mr. Chin-Bing and Ms. Farnham's desire to obfuscate their discriminatory decision included offering inconsistent testimony devoid of credibility at trial. Mr. Chin-Bing appeared to use his testimony at trial as an opportunity to cause further emotional distress to Ms. Nolasco and to disparage Ms. Chan — a goal he accomplished by asserting facts never before asserted before trial.[10] All of these facts evidence a display of malice or reckless indifference to Ms. Nolasco's federally protected rights of the sort that would entitle her to punitive damages.

### 2. Solaris' Actions Warrant a Finding of Punitive Damages Against the Company.

A plaintiff should be awarded punitive damages under Title VII upon establishing that the Defendant acted with the requisite state of mind — that is, that it "engaged in discriminatory practice . . . with malice or reckless indifference to the federally protected rights of [the plaintiff]." 42 U.S.C. § 1981a(b)(1). A punitive damages award against a company based on the reckless indifference of its employees is justified where a reasonable trier of fact finds that:

(1) The employer's decisionmaker discriminated in the face of a perceived risk that the decision would violate federal law;

(2) The decision maker was a principal or served the employer in a managerial capacity;

(3) The decisionmaker acted within the scope of his employment in making the challenged decision; and

---

[10] Mr. Chin-Bing testified, for example, that he chose Ms. Hung over Ms. Nolasco because he wanted someone in the position who he knew would succeed. Trial Tr. (vol. 2) 192:9-12. He further testified that Ms. Chan — rather than himself — had made a statement evidencing race-based discrimination during her exit interview. Mr. Chin-Bing provided he had not informed anyone of Ms. Chan's statement at any time prior to Trial. Trial Tr. (vol. 2) 192:24 – 193:15; 195:10-24

> (4) The employer failed to engage in good-faith efforts to comply with the law.

*EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008).

The first criterion is met where an employer's managerial agent has "at least a rudimentary knowledge" of the import of a federal anti-discrimination statute." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002). Both Mr. Chin-Bing and Ms. Farnham, through their positions of Chief Executive Officer and Vice President of Human Resources, respectively, knew that federal law protected Ms. Nolasco from discrimination based on her race and national origin. Both individuals acted in contravention of these protections when they made the decision to select Ms. Hung rather than Ms. Nolasco because Ms. Nolasco is not Asian.

Analysis of the second criterion requires consideration of "the type of authority that the employer gave the decisionmaker and the amount of discretion that the decisionmaker had in what was done and how it was accomplished." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 444 (4th Cir. 2000). Both Mr. Chin-Bing and Ms. Farnham, the decisionmakers in this matter, served Solaris in a managerial capacity.

The third criterion requires a showing that the decisionmaker's conduct was of the kind he was employed to perform, occurred substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer. *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 543-44 (1999). Both Mr. Chin-Bing and Ms. Farnham, the decisionmakers in this matter, acted within the scope of their employment in making and reviewing the promotional decision at issue.

Finally, Solaris failed to engage in good faith efforts to comply with the law, as required by the fourth criterion. It is the employer's burden to establish it engaged in good faith efforts to comply with Title VII. *Gallina v. Mintz*, 123 Fed. Appx. 558, 564 (4th Cir. 2005); *Golson v.*

*Green Tree Fin. Servicing Corp.*, 26 Fed. Appx. 209, 214-15 (4th Cir. 2002). Solaris has failed to meet this burden at trial.

"While an employer's institution of a written policy against race discrimination may go a long way toward dispelling any claim about the employer's reckless or malicious state of mind with respect to racial minorities, such a policy is not automatically a bar to the imposition of punitive damages." *Lowery,* 206 F.3d 431, 446 (citing *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 983-84 (4th Cir. 1997). In order to avoid liability for the discriminatory acts of one of its managers, an employer maintaining an EEO compliance policy must also take affirmative steps to ensure its implementation. *Fed. Express Corp.*, 513 F.3d at 374.

In *Lowery v. Circuit City Stores, Inc.*, the Fourth Circuit reviewed an award of $225,000.00 in punitive damages against a defendant in a failure to promote claim and found the award to be supported by the facts on the record. 206 F.3d 431 (4th Cir. 2000). In examining whether the defendant made a good-faith effort to comply with Title VII, the Court in *Lowery* noted:

> . . . [T]he sincerity of [employer's] commitment to a company-wide policy in the workplace is called into question when one considers the racially discriminatory attitudes of two top [employer] executives and the implementation of a promotional system by one of those executives having the capacity to mask race discrimination in promotional decisions.

*Id.* at 446. The Court found that one of the executives involved took steps to conceal evidence of discrimination within the company and deemed this further evidence of the defendant's lack of good faith. *Id.*

In intentionally failing to promote Ms. Nolasco, Mr. Chin-Bing and Ms. Farnham acted in the face of a perceived risk their actions violated federal law, in a managerial capacity, and within

the scope of their employment. Defendant cannot avoid punitive damages based on a showing of an effort to act in good faith, and Solaris failed to meet its burden of proving such an effort at trial.

A finding of punitive damages in the amount of $300,000.00 against Solaris would be equal to the amount of compensatory damages sought by Ms. Nolasco and would be appropriate given the particular actions of Solaris proven at trial.

### D. Plaintiff's Right to Attorneys' Fees and Costs

Attorneys' fees may be awarded to the prevailing part in a suit brought under Title VII. *Dennis*, 290 F.3d at 652; 42 U.S.C. § 2000e-5(k). Ms. Nolasco is entitled to all reasonable attorneys' fees and expenses incurred in relation to her claim against Solaris.

Should this court find Solaris liable for its failure to promote Ms. Nolasco in violation of Title VII, Ms. Nolasco will petition this Court for her fees and costs.


### CONCLUSION

Ample evidence presented at trial demonstrates Solaris engaged in race-based discrimination in violation of Title VII in its failure to promote Ms. Nolasco to the Head of Procurement position. This Court should find in favor of Ms. Nolasco and award her back pay in the amount of $6,735.72, compensatory damages in the amount of $300,000.00, punitive damages in the amount of $300,000.00, pre-judgment interest, reasonable attorneys' fees and costs.


Dated: November 26, 2024 _____*/s/*_____
Joshua Erlich, VA Bar No. 81298
Katherine L. Herrmann, VA Bar No. 83203
THE ERLICH LAW OFFICE, PLLC
1550 Wilson Blvd., Ste. 700
Arlington, VA  22209

Tel:    (703) 791-9087
Fax:    (703) 722-8114
Email: jerlich@erlichlawoffice.com
        kherrmann@erlichlawoffice.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 26, 2024, I served the foregoing electronically using the CM/ECF system, upon the following:

Yvette V. Gatling (VSB No. 92824)
Ashley D.N. Jones (VSB No. 94347)
Tiffany din Fagel Tse (VSB No. 92958)
LITTLER MENDELSON, P.C.
1800 Tysons Blvd., Suite 500
Tysons Corner, Virginia 22102
Telephone: (703) 286-3143
Facsimile: (703) 842-8211
Ygatling@littler.com

*Counsel for Defendant*

_____/s/_____
Katherine L. Herrmann, VA Bar No. 83203
The Erlich Law Office, PLLC
1550 Wilson Blvd., Suite 700
Arlington, VA 22209
Tel:     (703) 791-9087
Fax:     (703) 722-8114
Email: kherrmann@erlichlawoffice.com

*Counsel for Plaintiff*