IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| CLOVER NOLASCO, | ) |
| | ) |
| *Plaintiff*, | ) |
| v. | ) |
| | ) Case No. 1:23-cv-1631 (PTG/WBP) |
| SOLARIS PAPER, | ) |
| | ) |
| *Defendant.* | ) |

## MEMORANDUM OPINION AND ORDER

This employment discrimination case arises out of a dispute between Plaintiff Clover Nolasco ("Ms. Nolasco") and Defendant Solaris Paper, Inc. ("Solaris") related to Solaris's allegedly discriminatory failure to promote Ms. Nolasco to a managerial position. Ms. Nolasco claims that she was not promoted because of her race, Caucasian, and national origin, American. This case proceeded to trial on Ms. Nolasco's failure-to-promote claim.[1] On July 30, 2024, United States District Judge David J. Novak presided over the videotaped deposition testimony of Sheila Chan, Ms. Nolasco's former supervisor. Dkt. 61. On November 12, 2024, the Court held a one-day bench trial. Dkt. 82. At trial, the parties offered three witnesses and dozens of exhibits. Dkts. 82-1–82-3. Following trial, the parties submitted revised proposed findings of fact and conclusions of law. Dkts. 85–86. On December 2, 2024, Solaris filed a Motion to Strike Ms. Nolasco's proposed findings of fact and conclusions of law. Dkt. 87. For lack of good cause shown, Solaris's Motion to Strike Ms. Nolasco's proposed findings of fact and conclusions of law will be denied.

---

[1] On November 30, 2023, Ms. Nolasco filed a *pro se* Complaint against Solaris alleging constructive discharge and failure to promote based on race and national origin in violation of Title VII. Dkt. 1. On February 5, 2024, Ms. Nolasco retained counsel. Dkts. 12–13. On April 17, 2024, Solaris filed its Motion for Summary Judgment. Dkt. 15. On June 12, 2024, the Court granted Solaris summary judgment as it related to Ms. Nolasco's constructive discharge claim. Dkts. 39, 46.

1

Based on the evidence and witnesses presented at trial, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1.    Solaris manufactures towels and tissues and is affiliated with Mercury Paper ("Mercury"). Mercury and Solaris are two of the three companies that together comprise Asia Pulp & Paper Company. Mercury's headquarters is in Strasburg, Virginia.

2.    Ms. Nolasco is a former employee of Solaris Paper, Inc.

### Ms. Nolasco's Employment at Mercury

3.    In September 2018, Ms. Nolasco began working for Mercury as a Production Analyst at Mercury's Virginia location. At that time, she had actually applied for a Buyer position because she had extensive experience in that role. From 2004 to 2007, she served as a buyer in another company's procurement department. Later, Ms. Nolasco was promoted to Warehouse Customer Service Manager, performing all procurement responsibilities and managing fourteen employees. She held that position from 2007 to 2016. Instead of being offered the Buyer position when she joined Mercury, Ms. Nolasco was offered and accepted the Production Analyst position.

4.    In October 2018, within a month of her hire, Ms. Nolasco transferred into Mercury's Procurement Department, where she held the role of Buyer. In that role, she identified potential suppliers, analyzed quotes, and sought to identify cost savings for Solaris. As a Buyer, Ms. Nolasco reported to Andre Soetjahja ("Mr. Soetjahja"), who was the Head of Procurement until 2020.

5.    Sheila Chan ("Ms. Chan") worked in the Procurement Department at Solaris. In 2013, she was hired as a Buyer. In 2016, Ms. Chan was promoted to Purchasing Manager. Since

2

that time, Ms. Chan understood that she would succeed Mr. Soetjahja as the Head of Procurement. Ms. Chan was trained to assume Mr. Soetjahja's responsibilities.

6.      During this time, Ms. Nolasco distinguished herself as being the strongest Buyer in the Department.  In 2019, after a conversation between Mr. Soetjahja, Ms. Chan, and Ms. Nolasco, Ms. Nolasco was named as Ms. Chan's eventual successor to the Head of Procurement position. Shelley Farnham ("Ms. Farnham"), the Vice President of Solaris Human Resources, and Mr. Soetjahja, the then Head of Procurement, approved Ms. Chan's decision.   After this 2019 conversation, Ms. Chan began training Ms. Nolasco in the various skills and responsibilities needed to serve as Head of Procurement.

7.      Typically, Solaris uses an Individual Development Plan ("IDP") to formalize succession plans.  Ms. Chan and Ms. Nolasco did not complete a formalized IDP for Ms. Nolasco to succeed Ms. Chan.

8.      In 2020, Ms. Chan was promoted to Head of Procurement.  She reported directly to David Chin-Bing, the Chief Executive Officer ("CEO") of Solaris.  Ms. Chan oversaw three manufacturing locations and training of Buyers.

9.      In September 2020, Ms. Nolasco was promoted to Senior Buyer.  Individuals in the Senior Buyer position were required to receive their professional procurement certification.  To be eligible for the Senior Buyer promotion, Ms. Nolasco obtained this certification in June 2020.

10.     As a Senior Buyer, Ms. Nolasco supervised two Buyers.  She trained her direct reports on Solaris's standard operating procedures, procurement system, and all modules within that system covering Solaris's goods.

11.     At that time, Ms. Chan directly supervised Ms. Nolasco.  Ms. Nolasco worked very closely with Ms. Chan.  She assisted Ms. Chan with some of the managerial aspects of the position,

used her import/export skills, coordinated with all department heads, and travelled both locally and to California.

12.    In Ms. Nolasco's 2020 performance review, Ms. Chan indicated that "[f]or 2021, this is the year of learning direct material, base paper and finished goods to be my successor." Plaintiff's Exhibit ("PEX") I at 3.  Ms. Chan also gave Ms. Nolasco a top rating in several categories, including quality of work, productivity, teamwork, behavior and reliability, and leadership.  The review specifically noted that Ms. Nolasco always "aim [sic] for perfection," "meet [sic] deadlines," and "follow [sic] procedure." *Id.* at 1.  Indeed, the "Skills & Abilities" for the Senior Buyer position required "[g]ood analytical skills and attention to details," "[g]ood organizational skills, document control, filing," and "[l]eadership skills." PEX V at 3.

***Procurement Department Vacancy***

13.    On February 25, 2022, Ms. Chan submitted her resignation letter indicating she would leave the position of Head of Procurement effective March 11, 2022.  On February 26, 2022, Ms. Chan informed Mr. Chin-Bing and Ms. Farnham via phone that she had trained Ms. Nolasco and named Ms. Nolasco as her successor.

14.    Following Ms. Chan's resignation, Mr. Chin-Bing and Ms. Farnham developed a plan to restructure Solaris.  Pursuant to this restructuring, the Procurement Department would report to Ronald Iswono ("Mr. Iswono"), the Vice President of Logistics, Supply Chain, and Procurement.  The restructuring would also eliminate the Head of Procurement position and replace it with the Senior Procurement Manager position.

15.    On March 2, 2022, Ms. Chan had a meeting with Mr. Chin-Bing, in which Ms. Chan recommended Ms. Nolasco to replace her as the leader of the Procurement Department.  In this meeting, Mr. Chin-Bing indicated that Solaris Headquarters did not intend to promote Ms.

Nolasco and instead was considering Camil Hung ("Ms. Hung") for the open position. Mr. Chin-Bing told Ms. Chan that management was considering Ms. Hung because Ms. Hung "gave a very good impression" and "more importantly, . . . she was Asian." Dkt. 84, Chan Transcript ("Chan Tr.") 22:15–24.

16.    On March 3, 2022, Ms. Chan sent an email to Mr. Chin-Bing and Ms. Farnham in which Ms. Chan recommended that Ms. Nolasco "be promoted as Purchasing Manager to handle the procurement team." PEX C at 2.

17.    Ms. Farnham prepared a Manpower Request Form, dated March 4, 2022. The Manpower Request Form describes the qualifications of the vacant Procurement Department position. The form indicates that the vacant position title is "Senior Manager Procurement," and that the individual taking this job would be replacing Ms. Chan. Via handwritten notation, the form states "position changed from Procurement Head" to "Sr. Procurement Manager." PEX A.

18.    The Manpower Request Form defined the "competencies required" for the job as follows: (1) "[b]achelor's degree in business preferred"; (2) five years of procurement experience "strongly preferred"; (3) "management experience required"; (4) "[p]rocurement professional certificate" "nice to have"; (5) must have "attention to detail, process, follow-up and documentation." *Id.*

19.    On March 4, 2022—the same date of the Manpower Request Form—Ms. Farnham and Mr. Chin-Bing executed an Employee Status Changes Request Form. The Employee Status Changes Request Form memorialized the promotion of Ms. Hung to Senior Procurement Manager.

20.    Prior to her selection, Ms. Hung served as a Technical Manager at Solaris. Ms. Hung's highest level of education is a bachelor's degree in graphic design. Ms. Hung had not

previously worked in procurement at Solaris or any other employer. However, Ms. Hung worked closely with the Solaris Procurement Department during her tenure at the company.

21.    Ms. Nolasco worked in Solaris's Procurement Department since October 2018. At the time the Manpower Selection Form was drafted, Ms. Nolasco had approximately three and a half years of experience in Solaris's Procurement Department. Ms. Nolasco had a professional procurement certificate while Ms. Hung did not. Ms. Nolasco's highest level of education is a certificate of Business Operations from Blue Ridge Community and Technical College.

22.    Before joining Solaris, Ms. Nolasco also had experience working in procurement and in management. Ms. Nolasco served as a Warehouse Manager and Customer Service Manager from July 2007 until July 2016. As a Senior Buyer at Solaris, Ms. Nolasco supervised two employees. Ms. Nolasco never held a position at Solaris with the official title of "manager."

23.    On March 7, 2022, Solaris published an "Announcement" explaining: (1) Ms. Chan's resignation; (2) the company reorganization; and (3) Ms. Hung's promotion to Senior Procurement Manager.

24.    A day before this Announcement, Ms. Farnham called Ms. Chan and told Ms. Chan that Ms. Hung would receive the promotion. In explaining why Ms. Nolasco was not promoted, Ms. Farnham said Ms. Nolasco "checked off all the boxes except she's not Asian." Chan Tr. 30:18–25. After this, Ms. Chan told Ms. Nolasco that she would not be receiving the promotion. When Ms. Nolasco asked why, Ms. Chan told her that it was because she was not Asian.

*Ms. Nolasco's Conversations with Human Resources After Her Non-Selection*

25.    On March 7, 2022, Ms. Nolasco had a conversation with Ms. Farnham and Christy Lingham ("Ms. Lingham"), another human resources employee, about Ms. Nolasco's non-promotion.

6

26.     Ms. Farnham told Ms. Nolasco she was not selected for the Senior Procurement Manager position because Ms. Nolasco did not have a bachelor's degree and did not live in California.

27.     Neither Ms. Farnham nor Mr. Chin-Bing, nor anyone else at Solaris, asked Ms. Nolasco if she would be willing to relocate to California to take the Senior Procurement Manager position.[2]  The location of the "Senior Manager Procurement" job was listed as "United States (either east or west coast)."  PEX A.   There was no listed requirement of being located in California.

28.     Nor had anyone previously told Ms. Nolasco that she needed a bachelor's degree for the position.

29.     During their conversation, Ms. Farnham offered Ms. Nolasco a promotion to "a supervisor role in Virginia."  Dkt. 91 ("Trial Tr.") 142:2–6.

30.     On the afternoon of March 7, 2022, Ms. Nolasco emailed Ms. Farnham declining the supervisor position and informing Ms. Farnham of her resignation.  In this email, Ms. Nolasco also indicated that she felt she was "passed over for a promotion due to [her] ethnicity."  PEX F at 2.

31.     Ms. Farnham responded to Ms. Nolasco via email and stated that Ms. Hung's promotion "was based on her contributions, skills and managerial experience at Solaris."  *Id.* at 1. Ms. Farnham also indicated that the position was located in California.  *Id.*

---

[2] At trial, Ms. Nolasco credibly testified that she would have moved to California to take this position.

32.     Despite Ms. Nolasco raising an allegation of discrimination, Ms. Farnham did not provide Ms. Nolasco with information on how to report a complaint of discrimination, nor did Ms. Farnham direct Ms. Nolasco to an Equal Employment Opportunity policy.

33.     At trial, Ms. Farnham testified that "in-company managerial experience . . . was actually the number one thing that [Solaris was] looking at" when considering who would take this position. Trial Tr. 117:20–118:2, 127:5–15. Despite this, "in-company managerial experience" was never listed on the Manpower Request Form.

34.     Mr. Chin-Bing testified that what "set [Ms. Hung] apart" was that she was located in California. *Id.* 103:9–15. Ms. Farnham testified that the "position is sited in California" because the job "required working with the management staff, most of whom are located in California." *Id.* 118:16–22. This contradicts the Manpower Request Form.

35.     Ms. Farnham testified that "[t]here are a number of errors on this [Manpower Request] [F]orm" because Ms. Farnham copied the form from a prior version and did not properly update it for the Senior Procurement Manager position. *Id.* 121:21–23, 164:6–12.

36.     The Court does not credit Mr. Chin-Bing's and Ms. Farnham's testimony on this issue. It is not credible that the primary qualifications for the position would be omitted from the Manpower Request Form.

### *Ms. Nolasco's Conversations with Mr. Chin-Bing After Her Non-Selection*

37.     On March 9, 2022, Ms. Nolasco spoke with Mr. Chin-Bing regarding her non-selection. During this conversation Mr. Chin-Bing "was very upset" and "mocked" Ms. Nolasco's claims of discrimination. *Id.* 42:10–13. Mr. Chin-Bing told Ms. Nolasco that her non-selection was "not discrimination" and that "[w]e like the White people." *Id.* 42:12–14. Mr. Chin-Bing told Ms. Nolasco he wanted her "to teach and train" Ms. Hung. *Id.* 42:25–43:2.

38.    Mr. Chin-Bing testified that he was unaware of Ms. Nolasco's claims of discrimination until "two or three months" after Ms. Nolasco's resignation. *Id.* 180:5–181:11. The Court did not find this testimony credible. By this point, Ms. Nolasco had already raised the claim of discrimination with Ms. Farnham, the Vice President of Human Resources.

***Ms. Nolasco's Resignation, New Employment, and Harm Suffered***

39.    On March 7, 2022, Ms. Nolasco gave Solaris her resignation and indicated her last day of employment would be March 18, 2022. However, Ms. Nolasco continued to work at Solaris until April 8, 2022. During this time, Ms. Nolasco helped finish a large project she had been working on, trained Ms. Hung, and interviewed her replacement.

40.    When Ms. Hung was promoted to Senior Procurement Manager, her "Basic Salary" increased to $110,004.00. PEX E. Ms. Hung was allotted a yearly phone allowance of $960.00. *Id.* In the new position, Ms. Hung had the potential to earn a $9,167.00 bonus. *Id.* Solaris also requested another $15,000.00 for "performance bonuses over the course of the first 12 months in the position." *Id.*

41.    After she was not selected for the promotion, Ms. Nolasco felt "humiliated." Trial Tr. 56:5. She cried frequently and isolated herself. She found it "hard to function" and she did not want to spend time with her family or her grandchildren. *Id.* 56:23–57:2. Ms. Nolasco experienced physical manifestations of her emotional distress. She testified that she "had terrible headaches," could not sleep, and that her "hair came out in clumps." *Id.* 56:15–17.

42.    After she left Solaris, Ms. Nolasco began working for Robotic Research. At the time she left Solaris, Ms. Nolasco's salary was $64,000.00. When she started at Robotic Research, Ms. Nolasco's salary was $75,000.00. After working at Robotic Research for approximately one year, Ms. Nolasco received a promotion and her salary increased to $90,000.00. Ms. Nolasco later

received a second raise at Robotic Research, after which she earned $100,000.00. At the time of trial, Ms. Nolasco was working for Noblis and earning a salary of $136,000.00.

## CONCLUSIONS OF LAW

Ms. Nolasco brings claims against Solaris for failure to promote in violation of Title VII based on race and national origin. Dkt. 1. at 3–4. Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race . . . or national origin." 42 U.S.C. §2000e-2(a)(1). Race and national origin are "ideologically distinct" under Title VII. *Sarraj v. N. Va. Elec., Coop.*, No. 1:22-cv-12, 2022 WL 2820553, at *6 (E.D. Va. July 18, 2022) (quoting *Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 949 F. Supp. 13, 19 (D.D.C. 1996)). At trial, Ms. Chan testified that Ms. Hung is Taiwanese and Ms. Nolasco is American. Chan Tr. 23:14–22. However, no evidence was adduced at trial that any decision-maker made a statement about Ms. Nolasco's national origin or otherwise considered her national origin in the decision not to promote her. Accordingly, the Court finds that Ms. Nolasco did not satisfy her burden of proving discrimination based on national origin.

The Court will, however, analyze whether Ms. Nolasco proved discrimination based on race. To succeed on a race-based failure-to-promote claim, Ms. Nolasco may either produce direct evidence or circumstantial evidence of discrimination. *Marlow*, 749 F. Supp. 2d at 427–28. Here, the Court finds that Plaintiff has produced both direct and circumstantial evidence.

### *Direct Evidence of Discrimination*

"Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'" *Bandy v. City of Salem, Va.*, 59 F.4th 705, 711 (4th Cir. 2023) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d

219, 232 (4th Cir. 1999), *abrogated on other grounds by*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)).  Direct evidence can include "evidence that the employer 'announced, or admitted, or otherwise unmistakably indicated that [race or national origin] was a determining factor' in the particular employment action."  *Marlow v. Chesterfield Cnty. Sch. Bd.*, 749 F. Supp. 2d 417, 427 (E.D. Va. 2010) (quoting *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)).

The Court credits Ms. Chan's testimony that Mr. Chin-Bing told Ms. Chan that Ms. Hung was likely to be promoted because she "gave a very good impression with headquarters, and more importantly, that she was Asian."  Chan Tr. 22:17–20.  The Court also credits Ms. Chan's testimony that on March 6, 2022, Ms. Farnham called Ms. Chan to tell her that Ms. Nolasco would not be getting the promotion because although Ms. Nolasco "checked off all the boxes . . . she's not Asian."  *Id.* 30:17–25.  The Court finds Ms. Chan credible because she had no motive to fabricate her statements.  She had already departed Solaris and did so under favorable conditions. In fact, Ms. Chan testified about her appreciation of the opportunities that Solaris had afforded her professionally and personally.  Moreover, she received no advantage for reporting Mr. Chin-Bing's and Ms. Farnham's comments.  She did so because it was the right thing to do.  Ms. Chan took three days off from work and paid for her own flight and hotel expenses in order to testify.  *Id.* 44:6–9.

Mr. Chin-Bing's and Ms. Farnham's statements indicate that Ms. Nolasco's race "was a determining factor" in the decision not to promote her.  *Marlow*, 749 F. Supp. 2d at 427 (quoting *Cline*, 689 F.2d at 485).  Ms. Farnham and Mr. Chin-Bing both signed the Employee Status Changes Request Form that memorialized Ms. Hung's promotion and are therefore relevant decision-makers and employers at Solaris.

Mr. Chin-Bing and Ms. Farnham testified that they did not make statements about Ms. Nolasco or Ms. Hung's race to Ms. Chan. After evaluating the credibility of the witnesses, the Court finds that Ms. Chan's testimony is more credible than that of Ms. Farnham and Mr. Chin-Bing for the reasons stated. Ms. Chan's testimony proves that Ms. Nolasco's employer, through Mr. Chin-Bing and Ms. Farnham, "admitted . . . that [race] was a determining factor" in Ms. Hung's promotion and Ms. Nolasco's non-selection. *Marlow*, 749 F. Supp. 2d at 427 (citation omitted). These statements constitute direct evidence of race discrimination.

### Circumstantial Evidence of Discrimination

In the alternative, Ms. Nolasco offered circumstantial evidence of race discrimination. To prove a case of discrimination based on circumstantial evidence, Ms. Nolasco must satisfy the requirements of the *McDonnell Douglas* burden-shifting framework. *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 267 (4th Cir. 2005). The first step of this framework requires that Ms. Nolasco establish a prima facie case of discriminatory failure to promote. *Barnes v. Charles Cnty. Pub. Sch.*, 747 F. App'x 115, 117 (4th Cir. 2018). "Under the *McDonnell Douglas* framework, [Ms. Nolasco] can establish a prima facie case by showing that (1) she is a member of a protected group, (2) she applied for the position in question, (3) she was qualified for that position, and (4) the defendants rejected her application under circumstances that give rise to an inference of unlawful discrimination." *Anderson*, 406 F.3d at 268. Once Ms. Nolasco has established a prima facie case, the burden shifts to Solaris "'to articulate some legitimate, nondiscriminatory reason' for the decision not to promote." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If Solaris advances a non-discriminatory reason for Ms. Nolasco's non-promotion, Ms. Nolasco "retains the final burden of persuasion on the issue of intentional discrimination" and

must prove that Solaris's proffered reason is pretextual. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

The Court finds that Ms. Nolasco has established a prima facie case of race discrimination.[3] Ms. Nolasco's race is Caucasian, and she is therefore a part of a protected class. Ms. Nolasco showed an interest in the vacant procurement position. Based on the Manpower Request Form, Ms. Nolasco was qualified for the Senior Procurement Manager position.[4] This form, which Mr. Chin-Bing signed, listed (1) the position as located on either coast of the United States; (2) a bachelor's degree in business "preferred"; (3) at least five years of procurement experience "preferred"; and (4) "management experience" "required." PEX A. Ms. Nolasco gained management experience before she began working at Solaris and had over a decade of procurement experience. She lacked only a bachelor's degree in business, which was "preferred" and not required. *Id.* Even Ms. Hung, who was ultimately selected, lacked a bachelor's degree in business. Given these facts, Ms. Nolasco met the minimum requirements for the Senior Procurement Manager position. Accordingly, Ms. Nolasco has met the first three requirements of establishing a prima facie case of race discrimination.

Next, the Court turns to the final element—whether Ms. Nolasco has satisfied the "'relatively easy test' of showing" circumstances that give rise to an inference of unlawful discrimination. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996)

---

[3] Notably, in Solaris's Proposed Findings of Fact and Conclusions of Law filed after the bench trial in this matter, Solaris does not appear to contest that Ms. Nolasco established a prima facie case under the *McDonnell Douglas* framework. Instead, Solaris began its analysis with the second step of the burden-shifting framework, arguing it proffered a legitimate non-discriminatory reason for Ms. Nolasco's non-promotion. Dkt. 86 at 14.

[4] Based on the handwritten notation on the Manpower Request Form indicating that the Head of Procurement Position became the Senior Procurement Manager position after the restructuring, the Court finds that these positions are virtually identical. Whatever title was being used, the individual in this position was tasked with leading the Procurement Department at Solaris.

(quoting *Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984)). Starting in 2019, Ms. Nolasco had been identified and groomed to be the successor Head of the Procurement team. In fact, this was a decision that had been approved by Ms. Farnham as the head of Human Resources. Ms. Nolasco outperformed as a member of the procurement team. When Ms. Chan recommended Ms. Nolasco for the Senior Procurement Manager position, neither Mr. Chin-Bing nor Ms. Farnham challenged her qualifications. Instead, they moved to promote Ms. Hung to lead the Procurement Department even though she had no experience in the field. Neither Ms. Hung nor Ms. Nolasco have a bachelor's degree in business. But beyond that, Ms. Nolasco had every other qualification required for the role, while Ms. Hung lacked any experience in procurement. Furthermore, Mr. Chin-Bing and Ms. Farnham testified that Ms. Nolasco was not promoted, in part, because the job was located in California. Trial Tr. 103:9–15, 118:16–22. However, they never identified this as a requirement or spoke to Ms. Nolasco about whether she would be willing to relocate for the job prior to announcing the decision. Together, this evidence satisfies the relatively easy test of showing that Ms. Nolasco was not promoted under circumstances that give rise to an inference of unlawful discrimination.

The burden then shifts to Solaris to provide a non-discriminatory reason for its decision to promote Ms. Hung over Ms. Nolasco. *See Anderson*, 406 F.3d at 268. "[R]elative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision." *Evans*, 80 F.3d at 960. At trial, Solaris advanced the argument that Ms. Nolasco was not promoted because she did not have in-company managerial experience. Ms. Farnham testified that managerial experience at Solaris was the "number one thing that [they] were looking at" when considering individuals for the Senior Procurement Manager position. Trial Tr. 117:20–118:2. Although Ms. Nolasco did have managerial experience prior to joining Solaris, she

never served as a manager at Solaris. In contrast, Ms. Hung had been a manager at Solaris for ten years. Although not a minimum requirement for the position, Ms. Hung also has a bachelor's degree in graphic design, while Ms. Nolasco's highest level of education is a certificate of Business Operations. Ms. Hung's managerial experience at Solaris and her bachelor's degree serve as valid non-discriminatory explanations for Ms. Hung's promotion over Ms. Nolasco. Accordingly, the Court finds that Solaris has met its burden to provide a valid non-discriminatory reason for the failure to promote Ms. Nolasco.

Because Solaris has satisfied its burden, Ms. Nolasco has the final burden of showing that Solaris's rationales are pretextual. *Carter*, 33 F.3d at 458. "A plaintiff alleging a failure to promote can prove pretext by showing that [s]he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006). A plaintiff, however, cannot prove pretext "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). Moreover, "a plaintiff seeking to rebut an employer's reliance on inferior job qualifications cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination." *Id.* Nor can a plaintiff establish pretext "by relying on criteria of her choosing when the employer based its decision on other grounds." *Anderson*, 406 F.3d at 271.

In evaluating whether a rationale is pretextual, the Court does not consider "the wisdom or folly of [a defendant's] business judgment." *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 383 (4th Cir. 1995). Instead, "[t]he crucial issue in a Title VII is an unlawful discriminatory motive for a

defendant's conduct." *Id.* Further, "a plaintiff cannot point to minor discrepancies in an employer's promotion process to rebut the nondiscriminatory reason articulated by the employer; negligence is not discrimination and cannot sustain an action brought under Title VII." *Haywood v. Gutierrez*, No. 1:08-cv-981, 2009 WL 1208111, at *7 (E.D. Va. Apr. 30, 2009), *aff'd sub nom. Haywood v. Locke*, 387 F. App'x 355 (4th Cir. 2010).

Solaris offered evidence at trial that Ms. Hung was promoted because of her in-company managerial experience, her bachelor's degree, and location in California. The Court finds that Ms. Nolasco proved that each of these reasons were pretextual, and that Solaris's conduct had an "unlawful discriminatory motive." The Manpower Request Form for the Senior Procurement Manager position does not reference "in-company" managerial experience, and it indicates that the position would be located on either coast. PEX A. Ms. Farnham testified that these were mistakes because she had copied this information from a prior form. The Court finds this testimony is not worthy of credence for two reasons. First, this form was not just created by Ms. Farnham. Mr. Chin-Bing, the CEO, signed the Manpower Request Form, meaning he too attested to the fact that the listed qualifications were the requirements necessary for the position. It defies reason to believe that the most important requirements for the position would not be included, particularly after review by the Vice President of Human Resources and the CEO.

Second, when Ms. Nolasco questioned Ms. Farnham about why she would not be promoted, Ms. Farnham gave Ms. Nolasco two reasons for her non-promotion. Ms. Farnham stated (1) Ms. Nolasco lacked a bachelor's degree, and (2) the position was located in California. Trial Tr. 37:18–38:1. Ms. Farnham never stated that the lack of in-company managerial experience was an issue. If the Court were to believe Ms. Farnham's testimony that the "number one" consideration for filling the Senior Procurement Manager position was in-company managerial

16

experience, it strains credulity that Ms. Farnham would not have given this reason to Ms. Nolasco. *Id.* 117:18–118:2. The Court finds that this claim is nothing more than a post-hoc rationalization to justify Solaris's decision to not promote Ms. Nolasco.

As to Solaris's claim that Ms. Nolasco was not promoted because of her lack of a bachelor's degree and because the Senior Procurement Manager position was located in California, the Court also finds these reasons to be pretextual. Ms. Nolasco was never informed that having a bachelor's degree was a prerequisite for the Senior Procurement Manager or Head of Procurement position. Indeed, the Manpower Request Form stated that a bachelor's degree *in business* was *preferred*.[5] Likewise, the Manpower Request Form indicated the position could be on either the east or west coast. Neither Ms. Farnham nor Mr. Chin-Bing spoke to Ms. Nolasco about whether she would be willing to relocate to California to receive the promotion. Ms. Nolasco testified that she would have been willing to move to California. In sum, Mr. Chin-Bing's and Ms. Farnham's shifting qualification requirements along with the inconsistent reasons of why Ms. Nolasco was not promoted reek of post-hoc rationalizations and pretext. Accordingly, the Court finds that there is both direct and circumstantial evidence that Solaris is liable for race discrimination based on its failure to promote Ms. Nolasco.

***Damages***

Because the Court finds that Ms. Nolasco proved Solaris is liable under Title VII for failure to promote based on race, the Court will next determine the amount of damages to which Ms.

---

[5] Ms. Nolasco testified that if she was told that a bachelor's degree was a prerequisite for the position, she "probably would have went out and got the bachelor's." Trial Tr. 38:6–12. This testimony is corroborated by Ms. Nolasco's testimony that after she was informed that she needed a certification in procurement to be a Senior Buyer, she worked to receive this certificate.

Nolasco is entitled. Ms. Nolasco seeks back pay, compensatory damages, and punitive damages. The Court will address each of these in turn.

Under Title VII, a prevailing plaintiff is entitled to lost wages or back pay "that would have accrued from the time of the wrongful discharge through 'the time when the court *might* reinstate the employee.'" *Taylor v. Republic Servs., Inc.*, 968 F. Supp. 2d 768, 801 (E.D. Va. 2013) (quoting *Coles v. Deltaville Boatyard, LLC*, No. 3:10-cv-491, 2011 WL 4804871, at *8 (E.D. Va. Oct. 11, 2011)). Back pay is designed to make a prevailing plaintiff whole. *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985). "[T]he right of a successful Title VII plaintiff to claim back pay is limited in degree by the statutory duty to mitigate employer damages." *Id.* "[A]n employer may 'toll the accrual of backpay liability by unconditionally offering the claimant the job [s]he sought, and thereby providing h[er] with an opportunity to minimize damages.'" *Porter v. Wash. Suburban Sanitation Comm'n*, 2008 WL 11509683, at *1 (D. Md. Jan. 15, 2008) (quoting *Ford Motor Co. v. EEOC*, 458 U.S. 219, 228 (1982)).

Ms. Nolasco is entitled to back pay to compensate her from the time Ms. Hung was promoted over her until Ms. Nolasco's last day of working at Solaris. Although Solaris offered Ms. Nolasco a promotion, it did not offer her "the job [s]he sought." *Id.* at *1. Accordingly, awarding Ms. Nolasco back pay does not run afoul of Ms. Nolasco's statutory duty to mitigate damages. Ms. Nolasco testified that in her role as Senior Buyer, she earned approximately $64,000.00 annually. Assuming Ms. Nolasco was paid for fifty-two weeks of work per year, Ms. Nolasco's weekly income was approximately $1,230.77.[6] After receiving the promotion, Ms.

---

[6] Ms. Nolasco's post-trial proposed findings of fact and conclusions of law appear to calculate Ms. Nolasco's weekly income based on being paid for fifty weeks out of the year. Dkt. 85 at 22. However, there was no evidence adduced at trial to explain whether Ms. Nolasco was paid for fifty or fifty-two weeks a year. Accordingly, the Court will proceed finding that Ms. Nolasco worked, and was paid for, all fifty-two weeks in a year. Moreover, the USA Tissue Business Employee

Hung's "basic" annual salary increased to $110,004.00. PEX E. Ms. Hung also received a yearly phone allowance of $960.00. Therefore, Ms. Hung's guaranteed yearly salary totaled $110,964.00.[7] Assuming Ms. Hung was paid for fifty-two weeks of work per year, Ms. Hung's weekly income was approximately $2,133.92. Accordingly, had Ms. Nolasco been promoted she would have received an additional $903.15 per week, or an additional $180.63 per workday. Ms. Hung's promotion to Senior Procurement Manager was postdated to March 1, 2022. Ms. Nolasco testified that her last day at Solaris was April 8, 2022. March 1 to April 8 is a period of five weeks and three days. Accordingly, Ms. Nolasco is entitled to a back pay amount of $5,057.64.

Additionally, it is within the district court's discretion to award back pay with prejudgment interest. *Maksymchuk v. Frank*, 987 F.2d 1072, 1077 (4th Cir. 1993). "Prejudgment interest, of course, is 'an element of complete compensation.'" *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (quoting *West Virginia v. United States,* 479 U.S. 305, 310 (1987)). "A dollar tomorrow, unless interest is added, does not equal a dollar today." *Maksymchuck*, 987 F.2d at 1077. Accordingly, the Court finds that Ms. Nolasco is entitled to pre-judgment interest. It is in the district court's discretion to determine "[t]he appropriate pre-judgment interest rate." *Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730, 749 (E.D. Va. 2016). "The local state interest rate, as provided by state law, may be an appropriate rate of pre-judgment interest." *Id.* Virginia's statutory interest

---

Handbook states that employees receive "paid vacation benefits." Defendant's Exhibit ("DEX") 13 at 23. USA Tissue Business includes Solaris and Mercury. Trial Tr. 145:18–25.

[7] As the Senior Procurement Manager, Ms. Hung had the potential to earn bonuses totaling $24,167.00 However, because these were performance-based bonuses, and Ms. Nolasco did not produce evidence at trial that she would have received these bonuses, the Court will not include them in its calculation of back pay. *See Herring v. Thomasville Furniture Indus., Inc.*, 1999 WL 1937352, at *5 (M.D.N.C. Aug. 31, 1999) (calculating plaintiff's back pay award "without speculation regarding potential lost raises, promotions or benefits"); *see also Crump v. U.S. Dep't of Navy*, 205 F. Supp. 3d 730, 757 n.21 (E.D. Va. 2016) (including bonus in back pay award because plaintiff's evidence at trial showed the "bonuses were an expected part of [p]laintiff's compensation").

rate is six percent. Va. Code. Ann. § 6.2-302. "[U]nless principals of equity counsel otherwise, a court may award prejudgment interest, compounded annually." *Crump*, 205 F. Supp. 3d at 749. There are no facts in this case that counsel against an award of compound interest. Accordingly, the Court will award Ms. Nolasco pre-judgment interest of six percent compounded annually.

Under Title VII, a prevailing plaintiff may receive compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." *Republic Servs., Inc.*, 968 F. Supp. 2d. at 803–04 (quoting 42 U.S.C. § 1981a(b)(3)). "[A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress." *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546 (4th Cir. 2003). However, "[w]here a plaintiff's testimony is offered to support damages for emotional distress, such testimony must 'establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated.'" *Republic Servs., Inc.*, 968 F. Supp. 2d. at 804 (quoting *Bryant*, 333 F.3d at 546–47). Courts consider the following factors when determining an award of compensatory damages for emotional distress:

> (1) the loss of esteem from peers; (2) physical injury resulting from emotional distress; (3) psychological counseling or treatment; (4) loss of income or other pecuniary expense; (5) the degree of emotional distress; (6) the context of the events surrounding it; (7) evidence tending to corroborate the plaintiff's testimony; (8) the connection between the conduct at issue and the distress; (9) medical treatment rendered due to the distress; and (10) mitigating factors.

*Id.* (citing *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1254 (4th Cir. 1996)). The Fourth Circuit has affirmed awards of compensatory damages based on testimony of "embarrass[ment], frustrat[ion], and ang[er]" that manifested physically as "frequent headaches, insomnia, irregular menstrual cycles, nausea, [and] vomiting." *Bryant*, 333 F.3d at 547. The Fourth Circuit has also affirmed an award of $200,000.00—the applicable statutory cap in that instance—for emotional

20

distress damages based on the plaintiff's testimony that "she became anxious and ill." *Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 618 (4th Cir. 2007).

Here, Ms. Nolasco testified that she "felt humiliated" and "didn't feel valued." Trial Tr. 56:4–5. Ms. Nolasco testified that she "closed [her]self off" from her "support systems" and did not spend time with her family and grandchildren. *Id.* 56:4–57:2. Ms. Nolasco also testified that her feelings of emotional distress manifested physically in the form of "terrible headaches," insomnia, and her "hair [falling] out in clumps." *Id.* 56:15–17. Although Ms. Nolasco did not provide evidence of medical treatment, the Court finds that her testimony was not merely conclusory. Ms. Nolasco's testimony of the physical manifestations of her emotional distress was sufficiently particularized. Accordingly, the Court finds that Ms. Nolasco is entitled to $300,000.00 in compensatory damages for emotional distress.[8]

Under Title VII, a plaintiff may receive punitive damages "if they can demonstrate that an employer acted 'with malice or with reckless indifference to [their] federally protected rights.'" *Bryant*, 333 F.3d at 548 (quoting 42 U.S.C. § 1981a(b)(1)). Generally, under Virginia law "punitive damages may only be recovered where the plaintiff has made an express claim for them in the prayer for relief or *ad damnum* clause, sufficient to put the defendant on notice that an award of punitive damages is sought." *Harrell v. Woodson*, 353 S.E.2d 770, 773 (Va. 1987). Similarly,

---

[8] 42 U.S.C. § 1981a(3) creates a statutory cap on the amount of compensatory damages that may be awarded in instances of employment discrimination. For companies that employ more than 500 people for 20 or more weeks out of the year, the statutory cap on compensatory damages is $300,000.00. 42 U.S.C. § 1981a(3)(C). Mr. Chin-Bing testified that when he was CEO of Solaris between 600 and 700 employees reported to him. Trial Tr. 185:11–13. Therefore, the Court finds that here the applicable statutory cap is $300,000.00. "Back pay is explicitly excluded from compensatory damages under § 1981a; thus, if [a] [p]laintiff is entitled to back pay, any amount she is awarded will not be subject to the statutory cap." *Owen v. Rutherford Supply Corp.*, No. 3:19-cv-225, 2020 WL 4018937, at *3 (E.D. Va. July 16, 2020). Accordingly, the application of the $300,000.00 statutory cap does not foreclose Ms. Nolasco's recovery of additional back pay.

Federal Rule of Civil Procedure 8 requires a plaintiff's complaint to include "a demand for the relief sought." However, Federal Rule of Civil Procedure 54(c) provides that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Based on Rule 54(c), the bankruptcy court has found "[a] failure to specifically plead and demand exemplary damages will not bar an award of such damages . . . where the body of the complaint alleges facts sufficient to support the award." *In re Landbank Equity Corp.*, 83 B.R. 362, 376 (E.D. Va. 1987) (collecting cases); *see also Bowles v. Osmose Utils. Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006) (affirming award of punitive damages in a hostile work environment case pursuant to Rule 54(c) despite not being requested in the complaint); *Scutieri v. Paige*, 808 F.2d 785, 792 (11th Cir. 1987) (finding the district court erred by not instructing the jury on punitive damages because while the complaint did not include a request for punitive damages, it alleged conduct which would support such damages); *Guillen v. Kuykendall*, 470 F.2d 745, 748 (5th Cir. 1972) (same).

Here, Ms. Nolasco's *pro se* Complaint did not include a request for punitive damages. Moreover, the body of her *pro se* Complaint does not support an award of punitive damages. Dkt. 1. Accordingly, the Court finds that Ms. Nolasco is not entitled to punitive damages.

For the foregoing reasons, the Court finds in favor of Ms. Nolasco and finds that Solaris is liable for race discrimination. The Court finds that Ms. Nolasco is entitled to $5,057.64 in back pay damages, including pre-judgment interest of six percent, and $300,000.00 in compensatory damages. Accordingly, it is hereby

**ORDERED** that Defendant's Motion to Strike Plaintiff's Post-Trial Statement of Proposed Findings of Fact and Conclusions of Law (Dkt. 87) is **DENIED**; it is further

**ORDERED** that judgment be entered in favor of Ms. Nolasco in the total amount of $305,057.64 plus pre-judgment interest of six percent for Ms. Nolasco's back pay award of $5,057.64.

Entered this  15  day of September, 2025
Alexandria, Virginia

_____
Patricia Tolliver Giles
United States District Judge

23